**MILLAR BROS. & CO., Inc.,**
v.
**ARMOUR AND COMPANY**
(a corporation).
No. 14509.

United States District Court
E. D. Pennsylvania.
Oct. 9, 1956.

Einhorn & Schachtel, Robert B. Einhorn, Philadelphia, Pa., for plaintiff.

Robert A. Detweiler, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

In this action plaintiff seeks damages from the defendant for breach of a contract of sale. From the evidence we make the following

## Findings of Fact

1. Plaintiff, Millar Bros. & Co., Inc., is a Pennsylvania corporation engaged in the wholesale distribution of meat products.

2. Defendant, Armour and Company, is an Illinois corporation principally engaged in business as a meat packer in Chicago, Ill.

3. In early September 1951, Mr. Hess of Hess-Stephenson Co., meat brokers of Chicago, Ill., telephoned from Chicago to Philadelphia and informed Mr. Arnold Zitin, then an officer of plaintiff corporation, that defendant had a lot of fresh pork trimmings for sale. After discussion, plaintiff, by its officer Arnold Zitin, instructed Mr. Hess to buy 21,000 to 25,000 pounds of fresh pork trimmings at $.25¾ per pound, the price to include freight charges.

4. Written confirmation of the sale was sent to plaintiff on September 13, 1951, upon Hess-Stephenson's confirmation form No. 63204 setting forth the purchase by plaintiff of 21,000 to 25,000 pounds of fresh regular pork trimmings at $.25¾ C.A.F. Philadelphia, sight draft bill of lading Corn Exchange Bank, shipment Thursday, September 20, 1951.

5. The procedure then normally employed by defendant in preparation of fresh pork trimmings was as follows: After slaughter, the hog carcasses were placed in a cooling room with temperature between 32° and 38°; after one or two days they were removed to make the primal cuts which resulted, among other things, in pork trimmings; the trimmings were thereafter packed in barrels and placed in a freezer with temperatures between 28° and 32° where the trimmings remained twelve to fourteen hours or until the next day when they were taken to an enclosed area one floor below and about 400 yards from the freezer for loading purposes.

6. The evidence fails to show how the trimmings sold to plaintiff were prepared and does not establish that the normal preparation procedure was followed.

7. The normal loading procedure was to ice and brine the railroad car twenty-four hours in advance of loading; to take temperature readings before and after loading; to top off and add dry ice to the ice bunkers after loading for quick temperature reduction and to close, seal and deliver the car to the Chicago Junction Railroad.

8. The pork trimmings were delivered to Chicago Junction Railroad in car ARLX 11290 packed in 86 barrels stacked in rows two high and four wide.

9. This car was delivered by Chicago Junction Railroad to Baltimore and Ohio Railroad in Chicago, Ill. at 4:15 P.M., September 20, 1951, and arrived at Philadelphia at 7:24 A.M., September 22, 1951.

10. In transit this car was

(a) re-iced with 1600 pounds of ice and 128 pounds of salt at Willard, Ohio, at 4:00 A.M., September 21, 1951;

(b) re-iced with 1500 pounds of ice and 120 pounds of salt at Cumberland, Maryland, at 8:19 P.M., September 21, 1951;

(c) inspected at 9:10 A.M., September 22, 1951 at Philadelphia with ice bunkers approximately 9/10ths full and re-icing unnecessary;

(d) inspected at 9:05 A.M., September 23, 1951 with ice bunkers approximately 7/8ths full; re-iced at 1:40 P.M. that day with 1500 pounds of ice and 120 pounds of salt;

(e) inspected at 9:09 A.M., September 24, 1951 with ice bunkers 9/10ths full and re-icing unnecessary.

11. The initial icing, inspections and re-icing conformed to accepted practice and afforded the pork trimmings continuous adequate protection against spoilage after the car was loaded.

12. Upon delivery of the car to plaintiff's siding early on September 24, 1951, Mr. Zitin and other of plaintiff's employees immediately inspected the pork trimmings which were then smeary, sticky, beady and offensively odorous.

13. The pork trimmings, when delivered to plaintiff, were unfit for proc-

essing into meat products which was the use for which they were intended.

14. Plaintiff paid defendant the agreed contract price of $5,980.70 for the pork trimmings.

15. Plaintiff promptly caused the pork trimmings to be picked over, washed and placed in a curing brine solution for salvage and, as a result, from the shipment of 25,301 pounds, 21,426 pounds were salvaged with an after-salvage value of $.06 per lb.

16. At the time defendant loaded the pork trimmings on the car they were spoiled and unfit for the uses for which they were sold and intended.

17. Immediately following discovery of the spoiled condition of the pork trimmings, the plaintiff, through Mr. Zitin, on September 24, 1951 informed Mr. Hess of Hess-Stephenson by telephone of this condition.

18. The defendant first received notice indicative of a complaint about the condition of the pork trimmings in October 1951 by letter from Hess-Stephenson which requested that information concerning the shipment be furnished to plaintiff. The information was furnished by defendant to plaintiff by letter dated October 29, 1951.

19. Defendant received notice from plaintiff of the actual nature of complaint by telephone on November 28, 1951, which defendant acknowledged by letter that day.

20. By reason of the unfitness of the pork trimmings for the uses for which they were sold and intended plaintiff suffered a loss of $4,695.14.

### Discussion

■ The plaintiff's evidence supports the conviction that the spoilage did not result from lack of proper measures of preservation after delivery of the product by the defendant to the carrier. Though the defendant submitted evidence to show the customary method of processing pork trimmings for ultimate shipment, it offered no evidence relating to the processing of the particular lot of which this shipment was a part. Since the spoilage, which was immediately evident on arrival, did not occur in transit, the inescapable inference is that the deterioration began before shipment by the defendant.

■ Though this sale was consummated through Hess-Stephenson & Co., the evidence does not support the plaintiff's contention that this Company was the defendant's agent. Hess-Stephenson & Co. represented itself to be a broker and its written confirmation of the transaction so indicated. Plaintiff's telephoned direction to Mr. Hess to buy the pork trimmings was not inconsistent with such brokerage relationship. That direction was the plaintiff's offer to buy which was accepted when the written confirmation of sale was sent from Chicago to the plaintiff in Philadelphia. A contract exists by force of the law of the place where the last act necessary to the completion of the formation of the contract was done and, hence, this contract was an Illinois contract. 1 Williston on Contracts § 97.

■ Illinois has adopted the Uniform Sales Act, Ill.Rev.Stat.1955, c. 121½, § 1 et seq. Section 49 of that Act requires that notice of breach be given within a reasonable time. The plaintiff gave defendant notice of the actual details of the breach two months and four days after delivery of the defective product. During this period the plaintiff, uncertain of the cause of the spoilage and believing that it occurred in transit, was investigating the carrier's possible liability. It is not unreasonable to infer that defendant was put on notice that the shipment to the plaintiff was in some respect unsatisfactory when, prior to October 29, 1951, Hess-Stephenson requested defendant to furnish plaintiff with information about the handling of the car which transported the product. Under these circumstances and since lack of earlier notice in no way prejudiced the defendant, the notice to defendant on November 28, 1951 was given within a reasonable time.

### Conclusions of Law

1. The court has jurisdiction of the parties.

2. The court has jurisdiction of the subject matter.

3. The contract of sale is controlled by the law of Illinois.

4. Under all the circumstances plaintiff gave defendant notice of the spoiled condition of the pork trimmings within a reasonable time.

5. The plaintiff is entitled to recover its loss, with interest, from the defendant.

Judgment will be entered for the plaintiff upon submission by counsel of an appropriate form of judgment.